UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────┐
│ UNITED STATES OF AMERICA     │
│                              │
│     -v-                      │          09-cr-109 (JSR)
│                              │
│ ALEJANDRO PALACIOS RENGIFO,  │          OPINION AND ORDER
│                              │
│          Defendant.          │
│                              │
└─────────────────────────────┘
```

JED S. RAKOFF, U.S.D.J.:

Before the Court is the motion of defendant Alejandro Palacios Rengifo for sentence modification under 18 U.S.C. § 3582(c), commonly known as the "compassionate release" statute. On October 24, 2011, this Court sentenced Rengifo to 180 months' imprisonment and 3 years' supervised release following his conviction for substantive and conspiratorial hostage-taking charges in a bench trial on stipulated facts. Rengifo is scheduled to be released on December 31, 2022, which would mean that he will have served 12 years and 22 days in U.S. prison. At that time, he is expected to remain in immigration detention, pending his likely deportation to Colombia.

Rengifo was both a perpetrator and a victim of violence committed by the Fuerzas Armadas Revolucionarias de Colombia ("FARC"), a Marxist-Leninist guerilla group that was engaged in a violent conflict with the Colombian government from 1964 through 2016. During the conflict, the FARC financed its operations through various illegal activities, including narcotics production and trafficking, kidnapping for ransom,

extortion, and illegal gold mining.[1] Approximately 220,000 Colombians are thought to have died in the armed conflict through 2012, 81 percent of them civilians, and more than 8 million Colombians have registered with the Colombian government as conflict victims.[2] In 2016 the FARC and the Colombian government signed a comprehensive peace agreement, which received crucial support from the United States government, a longtime patron of the Colombian government. For the FARC as an organization, the peace accords led to disarmament and a transition into a Colombian political party. For FARC guerillas, the 2016 peace accords were intended to lead to demobilization and social reintegration through a new, transitional justice system.

As part of the deal, the Colombian government guaranteed that no FARC members would be extradited to the United States for crimes committed before December 1, 2016, when the peace accord took effect. The U.S. government -- which had a longstanding policy of aggressively prosecuting extradited FARC members for a wide array of criminal activities directed at the United States -- acquiesced in the extradition ban as part of President Barack Obama's policy of promoting the Colombian peace process.

---

[1] See Mapping Militant Organizations, "Revolutionary Armed Forces of Colombia (FARC)" Stanford University Center for International Security and Cooperation. (July 2019), https://cisac.fsi.stanford.edu/mappingmilitants/profiles/revolutionary-armed-forces-colombia-farc.

[2] June S. Beittel, Cong. Rsch. Serv., R43813, Colombia: Background and U.S. Relations 1 (2020).

Rengifo was a child soldier conscripted into the FARC in or around 1998 at age 13, when he was kidnapped from his rural village in the jungle near the Colombia-Panama border. Rengifo was then subjected to years of isolation, harsh treatment, and indoctrination. His FARC commanders provided repeated warnings and demonstrations that the FARC would seek to kill guerillas who tried to escape.

For approximately 10 months between 2008 and 2009, Rengifo was ordered to serve as one of the armed guards of a U.S. citizen kidnapped for ransom and held hostage in a makeshift jungle camp near the Colombia-Panama border. Rengifo had no role in the initial kidnapping and sought repeatedly to be relieved of guard duty. In 2009, Rengifo escaped from the FARC with several others, turned himself in to the Colombian government, and entered an amnesty program for reintegration of former FARC guerillas. At the time, the amnesty program permitted criminal prosecution and extradition of FARC members who had participated in kidnapping and other crimes against humanity. After the FARC's former hostage identified Rengifo in a photo book, the Colombian government located Rengifo in a demobilization camp and extradited him to face trial in this Court.

Rengifo, now 35 years old, moves this Court for modification of his sentence. See ECF 162 ("Mot.") Rengifo argues that there are several factors that together establish that "extraordinary and compelling reasons warrant" modification of his sentence. 18 U.S.C. § 3582(c)(1)(A)(i). These include his youth at the time of the offense and his demonstrated rehabilitation, his ill family members, the harsh

conditions of confinement implemented to control the spread of COVID-19 in prison, and the change in the law produced by the 2016 peace accords between Colombia and the FARC. The Government opposes Rengifo's motion. While it "acknowledges that the defendant has a commendable prison record," the Government contends that none of the issues Rengifo has raised establishes, separately or together, the "extraordinary and compelling reasons" required for sentence modification under section 3582(c).

After carefully considering the parties' papers and thoughtful presentations at oral argument, the Court holds that there are extraordinary and compelling reasons warranting Rengifo's early release. The Court therefore grants Rengifo's motion for sentence modification for the reasons set forth below. Rengifo's custodial sentence is hereby reduced to time served and his sentence of 3 years' supervised release is vacated. If Rengifo is to be deported, the Court recommends that the Government move as expeditiously as possible to return Rengifo to Colombia.

I.   **Factual Background**

A. **Rengifo's Upbringing**

Alejandro Palacios Rengifo was born in or about 1985 in a remote, impoverished region of Colombia near the Panamanian border. Pre-Sentence Report ("PSR") ¶ 60.[3] He had seven brothers and five sisters;

---

[3] Unless otherwise specified, all internal quotation marks, citations, omissions, alterations, and emphases are omitted from all sources cited herein.

the family lived without electricity or running water and often went hungry. Id. ¶¶ 61-62. Rengifo's father allegedly died of hunger. Id. ¶ 62. Rengifo never learned to read or write, and he saw his parents only intermittently, since they had to travel some distance to work in the fields. Id. ¶¶ 63, 72. In the late 1990s, guerrillas from the FARC and soldiers from paramilitary units began operating in the area of Rengifo's village, threatening residents and causing many to flee. Id. ¶¶ 65-66. In or around 1998, when Rengifo was 13 and his parents were out working in the fields, armed FARC guerrillas entered Rengifo's village, kidnapped him, and conscripted him into the FARC upon threat of death if he refused. Id. He was told that he would be killed if he ever tried to escape the FARC. Rengifo's family later fled the village, communicating with Rengifo every few years by phone. But the defendant only saw his family again after he was finally able to flee the FARC in 2009. Id. ¶ 67.

Meanwhile, Rengifo became a child soldier in the FARC's "57th Front," which operated in Colombia's Chocó Department, on the border with Panama. PSR ¶ 15. At the time, the 57th Front was involved in cocaine trafficking and hostage-taking to fund FARC activities and trafficking of supplies and armaments to supply itself and other components of the FARC. Id. The FARC commanders indoctrinated Rengifo in a culture of violence and guerrilla warfare while holding him and other child conscripts at the bottom of a strict hierarchy. These "conscripts" were forbidden to have contact with the outside world,

and were disciplined with harsh punishments, including manual labor. Mot. 6.

**B. <u>The Kidnapping of Padrón</u>**

The 57th Front engaged in a pattern of kidnapping and ransom as part of its efforts to finance the FARC.[4] The kidnappers included, among others, Julio Enrique Lemos-Moreno, who was one of Rengifo's commanders in the 57th Front, and a co-commander, Luis Fernando Mora-Pestana.[5] In 2008, Mora-Pestana and a corrupt Panamanian police officer named Roque Orobio Lobon set about identifying potential people to kidnap and ransom. Victim Cecilio Juan Padrón, an American citizen, was identified for kidnapping in late March 2008, and the kidnapping was set for April 2008. PSR ¶ 17. Lobon and other corrupt Panamanian police officers, acting under orders from Mora-Pestana and Lemos-Moreno, kidnapped Padrón on April 4, 2008 following a traffic stop, and they proceeded to smuggle him to a remote beach south of Panama City. PSR ¶¶ 19, 37. Another member of the 57th Front, Edilberto Berrio

---

[4] According to the PSR, FARC had generally instructed its members to kidnap and murder U.S. citizens and to attack U.S. interests in retaliation for the United States' support of the Colombian government and fumigation of coca crops. PSR ¶ 13.

[5] Lemos-Moreno and Mora-Pestana were eventually indicted, along with Mora-Pestana and three others, for conspiring to engage in terrorist activity in connection with their activities as commanders of the 57th Front. <u>See</u> <u>United States v. Mora-Pestana</u>, 08-cr-1290, ECF 11. Among the overt acts alleged in the indictment were acts of piracy committed against Panamanian police boats, possession and procurement of armaments and military equipment (including surface-to-air missiles and missile launchers), planning to bribe Panamanian officials to secure the release of imprisoned FARC commanders, procurement of bomb-making materials, cocaine trafficking, and the kidnapping of Padrón.

Ortiz and other 57th Front guerrillas were at the beach and took custody of Padrón, paid the initial kidnappers, and transported Padrón to a makeshift camp in the jungle. PSR ¶ 20.

Rengifo entered the story at the jungle camp. There, Rengifo, along with Berrio Ortiz, another co-conspirator named Anderson Chamapuro Dogirama, and three other 57th Front fighters, were ordered to guard Padrón and prevent his escape until the ransom was paid. Id. This period of detention lasted from approximately April 4, 2008 to February 2009. During this time, Rengifo and the others formed an armed squadron holding Padrón in captivity and threatening to kill him if he escaped. Id. ¶ 21. Other co-conspirators spoke to Padrón's family in Miami and threatened to injure or kill him unless a $16 million ransom was paid. Id. ¶¶ 21-22. Padrón's family ultimately negotiated a $3 million ransom, which was paid to the FARC on February 20, 2009 to secure Padrón's February 23, 2009 release. Id. ¶ 23.

In his presentence interview, Rengifo acknowledged his role as Padrón's guard but insisted that he did not volunteer for the role; he was ordered by his commanders to do it. Id. ¶ 37. Rengifo stated that he could not disobey the order and feared being killed if he did not comply. Id. Rengifo also said that he asked his commanders "four or five times" to be relieved of his guard duty, and that he became friendly with Padrón despite being ordered not to communicate so much with him. Id. ¶ 38. Rengifo stated that both he and Padrón cried at various times while sharing their life stories and talking about their families. Id.

C. **Rengifo's Escape from the FARC**

At one point, after speaking on the phone with his family, Rengifo learned that his mother needed money for a necessary eye surgery. Id. ¶ 39. Rengifo asked Mora-Pestana for financial assistance but was told there was no money available. Id. However, Rengifo disagreed and eventually stole money from the FARC to assist his mother. Id.

Shortly thereafter, Berrio Ortiz suggested that he and Rengifo should try to escape. Id. ¶ 40. Rengifo knew of other FARC members who had been killed following escape attempts, so he was scared, and he knew of other situations in which FARC members had informed on each other's suggestions of escape. Id. Eventually, after Rengifo had again asked his commander, Mora-Pestana, to be relieved of guard duty, Mora-Pestana ordered Rengifo to pack his belongings and travel to the base camp near the ocean to be assigned to another commander. Id. Rengifo, believing that Mora-Pestana knew he had stolen from the FARC and that he had caused problems by repeatedly asking to be relieved of guard duty, thought he was going to be executed when he reached the base camp. Id. Rengifo therefore decided to escape, and through the help of a cousin, escaped by boat with Berrio Ortiz, Dogirama, and two other FARC members approximately one week before Padrón's family paid the ransom. Id. Rengifo later learned that his cousin was killed by the FARC for assisting Rengifo and the others to escape from the jungle camp. Id.

After escaping from the FARC, Rengifo surrendered to Panamanian authorities and identified himself as a FARC combatant. Id. ¶ 41. The

Panamanians then turned Rengifo over to Colombian government, which placed him in a demobilization and amnesty program administered by the government to reintegrate former FARC guerillas into society.[6] Id. ¶ 68. He lived in Medellin during this period, which lasted until December 2009, attending educational and vocational programs. Id. ¶¶ 68, 80.

According to a psychological profile conducted as part of the PSR investigation, Rengifo's "time as a child soldier with the FARC was characterized by indoctrination, lack of autonomy, isolation, threats of severe punishment for disobedience and death for escape, and direct battle experience." Id. ¶ 74. The profile continues:

> [Rengifo's] reported mental state during his time as a child and adolescent soldier with the FARC is consistent with that of an individual subject to brutal, involuntary and hierarchical military system, much like those used in armies that conscript child soldiers. He described his belief that he would be killed should he disobey or escape the FARC. It is within this context that he served as a guard over a kidnaped man. When he ultimately escaped, he believed he would certainly be killed, either by the FARC who would capture him or the authorities to whom he turned himself in. Id.

The profile further reflects that at the time of the PSR investigation:

> [Rengifo demonstrated] symptoms consistent with having been traumatized and highly frightened about his safety for an extended period of his life. He manifests flashbacks of his commander, has frequent nightmares of being pursued and killed by the FARC and describes the hyperarousal that is characteristic of individuals from war zone[s] who have been exposed to traumatic situations.

---

[6] At the time, Colombia's demobilization program offered amnesty and social reintegration assistance to former FARC guerillas in exchange for intelligence, but it explicitly refused to provide services -- or amnesty - to those FARC guerillas who had committed "crimes against humanity," including hostage taking. Gov't Sent. Sub. 10-11 n. 6.

Notably, he reports that the most frightening experience of his life involves escaping the FARC because he felt it would bring certain death. Id. ¶ 75.

### D. **The 2016 Peace Agreement**

The fighting between the FARC and the Colombian government was the longest armed conflict in the Western Hemisphere when the two sides finally reached a comprehensive peace agreement in 2016. The agreement, entitled "Final Agreement to End the Armed Conflict and Build a Stable and Lasting Peace" ("Acuerdo Final para la Terminación del Conflicto y la Construcción de una Paz Estable y Duradera"), was signed on November 24, 2016 by the Colombian President Juan Manuel Santos and delegates of the FARC general staff, and it went into effect December 1, 2016 following approval by the Colombian Congress.[7] During a United Nations-monitored demobilization in 2017, approximately 13,200 FARC guerillas "disarmed, demobilized, and began the reintegration process."[8] The United States was a strong proponent of the peace process, which was significant because the United States had long supported the Colombian government through financial, intelligence, and law enforcement support.

The United States' participation in the peace process was critical to its eventual success, particularly on the key issue of extradition. Among the FARC leadership's top concerns was their personal exposure

---

[7] See "Final Agreement to End the Armed Conflict and Build a Stable and Lasting Peace," University of Edinburgh, Peace Agreements Database (Nov. 24, 2016), https://www.peaceagreements.org/viewmasterdocument/1845 ("Peace Agreement").

[8] Beittel, supra n. 2 at 13.

to being extradited to the United States, where many were subject to pending indictments.[9] In response, President Obama appointed veteran diplomat Bernard Aronson in February 2015 to join peace talks in Havana that had begun in 2012.[10] Then, in September 2015, U.S. Ambassador to Colombia Kevin Whitaker announced in an interview on Colombia's Radio Caracol that the United States would defer to the extradition decisions of the Colombian government and not press for extradition of FARC guerillas for crimes committed as part of the conflict.[11] Noting that approximately 2,000 Colombians had been extradited to the United States since 2002, when an extradition agreement came into effect, Ambassador Whitaker stated: "If you want to see that [future deferral] as the U.S.'s contribution to the peace process, you're welcome to do so," adding "[w]e're friends and allies and if we can help in this way we will."[12] In March 2016, Secretary of State John Kerry joined the Havana talks, the first time that a Secretary of State had met with the FARC.[13] As part of its engagement, the United States Government

---

[9] See Brodzinsky, "The key to ending Colombia's five-decade civil war could be the US," Guardian (May 19, 2015), https://www.theguardian.com/world/2015/may/19/colombia-peace-talks-farc-rebels-us-envoy-bernard-aronson.

[10] Id.

[11] BBC News, "US 'will not press for Farc extraditions' from Colombia," (Oct. 13, 2015), https://www.bbc.com/news/world-latin-america-34521725.

[12] Id.

[13] Brodzinsky and Roberts, "John Kerry holds unprecedented peace talks with Colombian Farc rebels," Guardian (Mar. 21, 2016),

confirmed that it would not insist on the extradition of FARC members indicted on drug trafficking and terrorism charges.[14]

Since the 2016 peace agreement was signed, the United States continues to officially support the peace accords. The State Department's webpage on U.S.-Colombia relations highlights that "the United States has provided more than $1 billion in direct and indirect support to peace implementation -- by far the largest contribution of any international partner."[15]

The peace agreement established a "Comprehensive System for Truth, Justice, Reparations, and Non-Recurrence" ("Sistema Integral de Verdad, Justicia, Reparación y No Repetición") to obtain justice for crimes committed by FARC guerillas during the conflict while eliciting confessions of crimes and social reintegration of their perpetrators.[16] Among the Comprehensive System's functional units is the "Special Jurisdiction for Peace" ("Jurisdicción Especial para la Paz") ("SJP"), which constitutes the judicial unit responsible for handling crimes committed during the conflict by FARC guerillas and agents of the state and which displaces normal Colombian criminal,

---

https://www.theguardian.com/world/2016/mar/22/john-kerry-unprecedented-peace-talks-colombia-farc-rebels-havana

[14] Id.

[15] U.S. Department of State, U.S. Relations with Colombia, (July 19, 2021), https://www.state.gov/u-s-relations-with-colombia.

[16] See Peace Agreement at 9.

disciplinary, or administrative processes in qualifying cases.[17] Although many crimes are subject to amnesty, "[n]either crimes against humanity nor other crimes set out in the Rome Statute are eligible for an amnesty."[18] The SJP is responsible for determining the scope of this amnesty and adjudicating cases involving crimes that are ineligible for amnesty.[19] Hostage taking, the crime for which Rengifo was extradited and convicted, is expressly made ineligible for amnesty and so is subject to SJP proceedings.[20]

Article 72 of the peace agreement's chapter establishing the SJP sets forth the limits on extradition of FARC members. It provides:

> Extradition may not be granted nor detention measures taken with the aim of extradition with regard to events or conduct covered by this system, caused by or occurring during the internal armed conflict or because of it up until its termination, whether it relates to crimes that are eligible or ineligible for amnesty, and particularly not for political crimes, the crime of rebellion or politically motivated crimes, whether committed inside or outside Colombia.

> This non-extradition guarantee covers all members of the FARC[] and persons accused of forming part of this organisation, in relation to any conduct taking place before the signing of the Final Agreement, for those people presenting themselves before the CS.... In the event that the conduct occurred prior to the signing of the Final Agreement, it will be referred to the Judicial Panel for Acknowledgement ..., in this case always excluding extradition. If it occurred after the signing of the Final Agreement, it will be referred to the competent judicial

---

[17] Id. Special Jurisdiction for Peace, arts. 25-33.

[18] Id., art. 25.

[19] Id., art. 26.

[20] Id., art. 40.

authority for investigation and prosecution in Colombia, without excluding the possibility of extradition.[21]

This extradition ban was subsequently incorporated into Colombia's Constitution through Legislative Act 01 of April 4, 2017, which established a transitional justice title.[22] Transitional Article 19 prohibits extradition of all members of the FARC (or people accused of being FARC guerillas) who submit to the jurisdiction of the Comprehensive System for crimes subject to the SJP that occurred during the violent conflict, whether or not subject to amnesty and whether they occurred inside or outside of Colombia.[23]

## II.  **Procedural History**

Rengifo was identified by Padrón from a photo book in March 2009, approximately three weeks after Padrón's release from captivity. Gov't Sent. Sub. 12. Rengifo and his co-defendants were then indicted in May 2009 and located among the former FARC guerillas in the Colombian demobilization program. Rengifo was arrested on a provisional arrest warrant in December 2009, and the United States sought his extradition. Id. at 12-13. He was extradited thereafter and arrived in the Southern District of New York on December 9, 2010 after spending approximately 10 months in a Colombian prison. Mot. 10. Following a three-day

---

[21] Id., art. 72.

[22] L. 1/2017, abril 4, 2017, (Colom.),   https://www.funcion publica.gov.co/eva/gestornormativo/norma.php?i=80615.

[23] Constitución Política de Colombia [C.P.], Art. Transitorio 19, https://perma.cc/VCD9-F3LU.

hearing, the Court denied Rengifo's application to assert a duress defense. See United States v. Pestana, 865 F. Supp. 2d 357 (S.D.N.Y. 2011) aff'd sub nom United States v. Ortiz, 525 F. App'x 41 (2d Cir. 2013). Rengifo and his co-defendants proceeded to a bench trial on stipulated facts; Rengifo was convicted of hostage-taking and conspiracy to commit hostage-taking on June 20, 2011.

At sentencing, the Guidelines range called for life imprisonment. PSR at 22. For Rengifo, the Court instead imposed a sentence of 180 months' imprisonment and 3 years' supervised release, stating on the record that it was "the most merciful sentence [it could] impose" in light of the need to deter kidnappings of U.S. citizens and indicate that the U.S. government stands ready to protect and redress injuries to U.S. citizens abroad. Sent. Transcript 45-47.

Rengifo has previously, but unsuccessfully, sought post-conviction relief in several ways, including through direct appeal of his conviction and a motion to vacate his sentence under 28 U.S.C. § 2255. See Opp. 5. He is currently incarcerated at FCI Sandstone and has a projected release date of December 31, 2022. Opp. 5. At that time, Rengifo will likely remain detained by the immigration authorities pending his eventual deportation to Colombia.

## III.   **Legal Standard**

District courts are authorized to modify a defendant's term of imprisonment under 18 U.S.C. § 3582(c)(1)(A)(i). The now-familiar standard requires the Court to "ask four questions: (1) has the defendant complied with the administrative exhaustion requirement, (2)

has the defendant shown extraordinary and compelling reasons warranting a sentence reduction, (3) are the 18 U.S.C. § 3553(a) sentencing factors consistent with a lesser sentence than that previously imposed, and (4) is there a particular sentence reduction consistent with the § 3553(a) factors that is also warranted by extraordinary and compelling reasons." United States v. Garcia, 505 F. Supp. 3d 328, 331 (S.D.N.Y. 2020). In United States v. Brooker, the Second Circuit held that the compassionate release statute, as revised by the First Step Act, vests district courts with the discretion to determine what facts amount to "extraordinary and compelling reasons" justifying release, when (as now) the Sentencing Commission has issued no on-point regulation defining that phrase and the existing Guidelines "now apply[] only to those motions that the BOP has made." 976 F.3d 235 (2d Cir. 2020).[24] However, "[a]lthough the policy statements and application notes are no longer applicable post-Brooker, they are instructive." Garavito-Garcia v. United States, 2021 WL 2525037, at *4 (S.D.N.Y. June 21, 2021).

IV.  **Analysis**

Turning to the first prong for compassionate release, there is no dispute that Rengifo has satisfied the exhaustion requirement. On May 27, 2021, Rengifo applied to the Warden of FCI Sandstone for the

---

[24] Even absent Sentencing Commission regulations, however 18 U.S.C. § 994(t) prohibits district courts from finding that rehabilitation, standing alone, constitutes an "extraordinary and compelling reason" justifying release. This limitation is inapposite here, because Rengifo does not rely solely on his rehabilitation.

BOP to bring a motion for sentence modification on his behalf. That request was denied in letters dated June 25 and June 28, 2021. <u>See</u> Mot. 17; ECF 161-6.

The next prong, and key issue here, is whether extraordinary and compelling reasons warrant reduction of Rengifo's sentence. Rengifo points to a range of combination factors that the Court will address in several categories: the legal effect of the 2016 Colombian peace process, Rengifo's youth at the time of the crime and his subsequent rehabilitation, illnesses among Rengifo's family members, and harsh conditions of confinement he experienced due to the COVID-19 pandemic. The Court concludes that, while none of the factors necessarily warrants relief by itself, taken in combination they constitute extraordinary and compelling reasons that satisfy the second prong.

### A. <u>Changes in Colombian Law Under the 2016 Peace Agreement</u>

Rengifo is one of nine people named in the 2009 indictment for Padrón's kidnapping, but only Rengifo and three others who left the FARC in 2009 were brought to New York for prosecution. Rengifo's co-defendant and former commander in the 57th Front, Lemos-Moreno, remained in the FARC until after the 2016 peace agreement took effect and has never been extradited to the United States. In 2017 the United States sought extradition of Lemos-Moreno, who was one of the masterminds of Padrón's kidnapping, after he surrendered to Colombian authorities and presented himself to a demobilization center. But Lemos-Moreno's extradition was ultimately prohibited by the Colombian Supreme Court under the 2016 peace agreement, which bars extradition

of FARC members for crimes committed during the 52-year conflict.[25] Therefore, while Lemos-Moreno remains theoretically subject to arrest and prosecution in the United States for his numerous crimes, so long as he remains in Colombia, Lemos-Moreno remains beyond the Government's reach due to the peace agreement the United States itself supported.

Rengifo argues that it is unfair for him to sit in prison while "perhaps the most culpable co-defendant" remains free and protected by a later change in Colombian law. Mot. 21. Rengifo argues that the key difference is that he risked his life to escape the FARC in 2009 and confessed his role as a FARC guerilla to the Colombian government at that time, whereas Lemos-Moreno remained in the FARC, committing criminal and violent acts for seven more years, until the 2016 peace agreement came into effect and barred his extradition. Rengifo argues that Lemos-Moreno has therefore received a "windfall," resulting in an unjust sentencing disparity that the Court should address through this motion for sentence reduction. Mot. 21.

The Government argues in response that there is no cognizable "disparity" between Rengifo and Lemos-Moreno, because "the 'windfall' that was bestowed upon Lemos-Moreno was not the result of intervening changes in United States law, but rather the independent actions of a foreign government, i.e., the Colombian government's decision to no longer extradite individuals such as Lemos-Moreno." Opp. 13. The fact

---

[25] See Corte Suprema de Justicia [C.S.J.] [Supreme Court], Sala. Pen. Mayo 31, 2017, M.P. L.A. Hernández Barbosa, AP3393-2017 Rad. 50220 (Colom.) ("Lemos-Moreno Decision").

that Lemos-Moreno got a lucky break, the Government argues, in no way diminishes Rengifo's crime or warrants a reduction in his sentence.[26]

The Government is correct that there is no legally cognizable sentencing disparity between Rengifo and Lemos-Moreno. One member of a criminal conspiracy has no right to be released because his confederate evaded the government and remained on the lam. The Government has never dismissed the remainder of its indictment or otherwise disavowed its intent to prosecute Lemos-Moreno, should he become subject to American jurisdiction. To the contrary, the Government has made high-level efforts to secure Lemos-Moreno's extradition for prosecution on two outstanding indictments, going so far as to have the U.S. Ambassador to Colombia criticize the Colombian Supreme Court's decision prohibiting his extradition.[27] There may be little chance that the Government will prosecute Lemos-Moreno at this point, but that is not for lack of trying. And if the Government ever apprehended Lemos-Moreno and obtained a conviction, he would likely receive a severe sentence.

---

[26] Rengifo also argues that there is a disparity between his 180-month sentence and the 60-month sentence imposed on his co-defendant Lobon, the corrupt Panamanian police officer who committed Padron's initial kidnapping. Mot. 11-12. While Lobon may be more culpable, his case, as the Government correctly argues, is readily distinguishable from Rengifo's (and so there is no legally cognizable disparity) because Lobon provided substantial assistance to the Government. Opp. 12.

[27] See Letter from U.S. Ambassador Kevin Whitaker to Presidente Fernandez Carlier, Supreme Court of Colombia (June 7, 2017), https://perma.cc/8QMC-8C9T ("Whitaker Letter").

Nonetheless, the Court acknowledges that there is a certain unfairness in the fact that Rengifo would not have been convicted on this indictment had he remained in the FARC through the end of the conflict. But this unfairness arises from the fundamental change in Colombian law that occurred after Rengifo's conviction, not from the fact that Rengifo was sentenced and Lemos-Moreno remains at large. The Court will therefore consider whether Colombia's implementation of the peace agreement, specifically its prohibition on extraditing FARC members for committed crimes during the conflict, constitutes an extraordinary and compelling reason that weighs in favor of modifying Rengifo's sentence. This analysis involves two questions. First, whether the peace agreement would have barred Rengifo's extradition if he had surrendered to Colombian authorities after the conflict formally concluded on December 1, 2016; and second, whether that change in Colombian law may qualify as an extraordinary and compelling circumstance under 18 U.S.C. § 3582(c).

### a. Application of the Change in Law to Rengifo

The first issue is whether the 2016 peace agreement would have prohibited Rengifo's extradition on this indictment had the current Colombian extradition law been in place at the time of his surrender. The Government contends that "[i]t is ... mere speculation that had the defendant not escaped the FARC in 2009, he would have in fact received the same 'windfall' as Lemos-Moreno nearly a decade later." Opp. 13 n. 8. Rengifo argues, and the Court agrees, that the

appropriate starting point for this analysis is the Colombian Supreme Court's resolution of the Lemos-Moreno case.

Lemos-Moreno surrendered shortly after the peace took effect, and he was subsequently detained in a demobilization camp in the Department of Córdoba.[28] On February 2017, Lemos-Moreno was arrested by the National Police on a warrant from the Attorney General's Office while he was traveling to authorized medical appointments in Medellín.[29] The United States subsequently formalized its extradition request on April 20, 2017, citing the two open indictments in this District, and the Colombian Ministry of Justice and Law referred the extradition case to the Colombian Supreme Court.[30] The United States took the position that Lemos-Moreno could be extradited notwithstanding the peace agreement because, inter alia, Lemos Moreno was motivated to order Padrón's kidnapping for his own personal gain, not for the FARC's financial support.[31] Nonetheless, the Colombian Supreme Court held that the Padrón kidnapping and all other crimes described in the two indictments against Lemos-Moreno were, on the face of the indictments themselves, alleged to have occurred in connection with his FARC membership and before the peace agreement was signed.[32] The Court

---

[28] Lemos-Moreno Decision, Background ¶ 5.

[29] Id.

[30] Id. ¶ 7.

[31] See Whitaker Letter.

[32] Lemos-Moreno Decision, Considerations of the Court ¶ 2.

therefore held that Transitional Article 19 of the Colombian
constitution prohibited Lemos-Moreno's extradition and ordered his
immediate release.[33] It further concluded that although the crimes had
been committed before the extradition ban was incorporated into
Colombian law, the doctrine of supervening unconstitutionality applied
retroactively to the Padrón kidnapping.[34]

In so holding, the Colombian Supreme Court has held that the 2017
amendment to the Colombian Constitution bars Rengifo's co-defendant's
extradition on the same indictment for the same crime for which Rengifo
is incarcerated. The Government offers no plausible distinction
between Rengifo's and Lemos-Moreno's cases that would suggest that
Rengifo -- Lemos-Moreno's subordinate -- would not have been protected
by Colombia's extradition ban if he had not reluctantly surrendered
and been extradited before it took effect.[35] Therefore, the Court

---

[33] Id. ¶ 5.

[34] Id. ¶ 3.

[35] The Government argues that Rengifo may not have qualified for
protection from extradition because he did not confess to having
guarded Padron when he surrendered to the Colombian government in
2009. See Opp. 12 n. 7. But neither Article 72 of the Peace Agreement
nor Transitional Article 19 of the Colombian constitution makes
protection from extradition dependent on confession; protection
depends on the nature of the crime, the time of the crime, and
membership in the FARC or another covered group. Under Article 72, a
person shielded from extradition is referred to the Judicial Panel for
Acknowledgement of the Truth, Responsibility and Determination of
Facts and Conduct of the Special Jurisdiction for Peace but "always
excluding extradition." Peace Agreement, art. 72. The Peace Agreement
then provides different sanctions regimes that might apply, depending
on whether the person "acknowledge[d] exhaustive, complete and
detailed truth before the Judicial panel for Acknowledgement of Truth
and Responsibility," and if so, when. See Peace Agreement, List of

concludes that the change in Colombian law would have prevented Rengifo's extradition on the instant indictment, had the current extradition law been in place at the time of his surrender.

   b. Implication for the Instant Motion

Having concluded that the 2017 amendment to the Colombian constitution would have barred Rengifo's extradition on this indictment had the current extradition law been in effect, the Court must now determine what, if any, implication that change in U.S. law has for Rengifo's sentence modification motion.

This Court has already held that a subsequent change in U.S. law upon which a sentence depends may constitute an extraordinary and compelling reason warranting a sentence reduction. United States v. Ballard, 2021 WL 3285009, at *5 (S.D.N.Y. Aug. 2, 2021). Ballard concerned a defendant sentenced to fifty years' incarceration due to a since-repealed "stacking" provision requiring consecutive mandatory minimum sentences of 25 years on each of two convictions under 18 U.S.C. § 924(c). Id. at *3. There, the Government "concede[d] that the change in the law, even standing alone f[ell] within the category of circumstances that under Brooker, the court may determine are

_____

Sanctions. The extent of Rengifo's confession upon his surrender does not, therefore, appear to be relevant to whether he would have been extradited, had the current legal regime applied at the time of his surrender.

extraordinary and compelling and therefore warrant a sentence reduction." Id. at *4.[36]

Here, by contrast, the Government argues that the change in Colombian law emerging from the 2016 peace agreement has no bearing on Rengifo's motion, because "there has been no change in United States sentencing law that would cause the Defendant to receive a lower sentence today than he did in 2011." Opp. 12-13. The Government is of course correct that there has been no change in United States law relevant to Rengifo's motion. But the Government has provided no authority for the proposition that only a subsequent change in the U.S. sentencing law is relevant to a court's consideration of a sentence reduction motion. Nor has the Government explained why the discretion that Brooker vested in district courts "to consider whether any reasons are extraordinary and compelling" would not permit consideration of changes to foreign law that led directly to the conviction and sentence at issue.

At the same time, it is obvious that not every subsequent change to a U.S. Code provision upon which the Government relied in obtaining a conviction and sentence establishes an extraordinary and compelling reason to modify that sentence. And changes to foreign law are even less likely to warrant sentence reduction. Yet Colombia's wholesale ban on extraditing FARC members for crimes committed during the armed

---

[36] Of course, the Government's position in another case does not amount to a concession here, because there is no collateral estoppel against the Government.

conflict exhibits several factors that might elevate this change in the law to an extraordinary and compelling circumstance weighing in Rengifo's favor.

First, the change was to a law that was necessary to imposition of the instant sentence. If the extradition ban had been effective at the time Rengifo surrendered, the United States Government almost certainly would not have obtained Rengifo's conviction: he very likely could have avoided ever becoming subject to the U.S. Government's criminal jurisdiction, like Lemos-Moreno and countless other international fugitives.[37] The Government has not suggested any way it could have apprehended Rengifo absent Colombia's cooperation with its extradition request. The fact that Lemos-Moreno remains at large corroborates this point. Therefore, the Court concludes that Rengifo never would have been subject to this sentence but for the now-modified Colombian legal regime.

Second, the relevant change was part of a comprehensive and fundamental reform of Colombian law. Rengifo is not relying on a technical change that created a loophole or a judicial decision narrowing application of a relevant statute. Colombia's ban on extradition of FARC guerillas arose through a multi-year peace process and was ultimately written into the Colombian constitution. This was

---

[37] Unlike some other international fugitives, however, FARC guerillas who remain in Colombia and so are protected by the extradition ban, including Lemos-Moreno, did not flee to a country with the specific intent of finding a haven lacking an extradition treaty with the United States.

a core element of the transitional justice structure that radically reshaped Colombian criminal law aiming to achieve several extremely compelling governmental purposes, including ending a 52-year armed conflict and reintegrating tens of thousands of guerillas into society. The extradition ban was a central component of the overall scheme. Moreover, Rengifo (and Lemos-Moreno) are precisely the type of people intended to be covered by this comprehensive scheme. Under current Colombian law, FARC guerillas who engaged in hostage-taking are subject to the procedures of the SJP, an institution designed to balance the strains arising from this post-conflict, transitional justice context.

Third, the United States not only endorsed but actively cooperated in bringing about the change in Colombian extradition law. As explained above, the U.S. Government's agreement to defer to Colombian decisions on extradition of former FARC guerillas for crimes committed during the armed conflict was essential to advancing the peace process toward the 2016 peace agreement. While the Government would still prosecute Lemos-Moreno and other former FARC guerillas if it could, President Obama's agreement to forego extradition of certain fugitives relinquished, at least in practical terms, the Government's ability to prosecute cases against FARC guerillas who committed crimes against the United States. The Government rightly views these as terrible crimes requiring severe punishment; but the Executive Branch's decision to urge the Colombian government to enter a peace accord that would bar future extraditions reflects the broader policy judgment that ending the half-century armed conflict was a higher priority than

apprehending and incarcerating people who committed crimes to fuel that violence. Accordingly, recognizing the change in Colombian law through reduction of a sentence imposed before the peace agreement is not inconsistent with the United States' overall policy toward the FARC.

But having said all this, it still might be a close question whether this change in Colombian law, standing alone, would constitute an extraordinary and compelling circumstance sufficient to meet the second requirement of compassionate release. But the Court need not resolve that question, because there is nothing in the compassionate release law requiring that a determination of extraordinary and compelling factors warranting compassionate release must be based on a single circumstance. Rather, as the law permits and common sense dictates, the finding of extraordinary and compelling circumstances warranting release can be based on a combination of circumstances taken together. Indeed, the statute, by declaring that rehabilitation alone is not sufficient to constitute such an extraordinary and compelling circumstance, explicitly indicates that a combination of circumstances may suffice. So the Court now turns to other circumstances bearing on this issue.

### B. **Rengifo's Youth at the Time of the Crime and His Subsequent Rehabilitation**

Rengifo argues that his rehabilitation while in prison, combined with his youth at the time of the offense, weighs in favor of finding that there are extraordinary and compelling reasons warranting his

release.   The   Government   treats   these   issues   separately.   It
"acknowledges that the defendant has a commendable prison record,"
including  a  good  disciplinary  record  and  the  completion  of  "a
substantial amount of educational programming while in prison." Opp.
9, 16. But it nonetheless contends that "this record falls short of
the sort of extraordinary ... rehabilitation that this Court has found
to warrant compassionate release elsewhere." Opp. 9. The Government
also argues that Rengifo's age at the time of the offense should not
play  any  role  in  the  Court's  consideration  of  his  motion  for
modification of his sentence. Id. at 14-15.

However, in this case, analysis of Rengifo's rehabilitation is
inseparable from consideration of his youth at the time of the offense,
and both his rehabilitation and his age weigh in favor of granting
this motion. The Supreme Court has repeatedly "stated that youth
matters in sentencing" Jones v. Mississippi, 141 S.Ct. 1307, 1314
(2021). Applying the Eighth Amendment, the Court has directed courts
to consider "the distinctive attributes of youth" when sentencing,
because they "diminish the penological justifications" of sentences,
even when "juvenile offenders ... commit terrible crimes." Miller v.
Alabama, 567 U.S. 460, 472 (2012). This Court has already recognized
that youth continues to matter when a district court reviews a sentence
on a motion for sentence modification. See United States v. Ramsay,
2021 WL 1877963, at *13 (S.D.N.Y. May 11, 2021). Indeed, in that case,
the Court explained that "[i]t is all the more important for federal
courts to recognize the salvageability of adolescent offenders because

(with very limited exceptions[]) the federal criminal justice system no longer permits parole." Id at *15. As a consequence, "even an offender who demonstrates that he has matured beyond the seemingly incorrigible person of his youth will have no chance to show his rehabilitation" and obtain early release. Id. (quoting United States v. Portillo, 981 F.3d 181, 187 (2d Cir. 2020)). District courts should therefore consider a motion for sentence modification through the lens of the distinctive attributes of youth, which "can be usefully grouped into four traits: youthful offenders' immaturity, susceptibility, salvageability, and dependence." Id. at *7.

Rengifo was 23 years old at the time he guarded Padrón in the jungle camp. The Government therefore argues that Rengifo was too old to benefit from the leniency urged in Ramsay, because that case relies on cognitive neuroscience findings that "[t]he prevailing neuroscientific explanation for adolescents' immaturity begins with the fact that the frontal lobes, home to key components of the neural circuitry underlying 'executive functions' ... may not be fully developed until halfway through the third decade of life." Id. at *8; see Opp. 15. To be sure, Ramsay also noted that "[h]istory counsels hesitancy, especially when brain science is offered as evidence about individuals in particular cases." Id. at *7. The point is rather "that courts cannot simply treat anyone over 18 as an 'adult' for sentencing purposes but must inquire whether the human being they are about to sentence is still in many respects an adolescent." Id. at *13.

While Rengifo was older when he committed the instant offense than was the defendant in _Ramsay_, the Court concludes that consideration of his youth is still appropriate. Each of the four traits that _Ramsay_ identified as distinctive of youth is implicated by Rengifo's upbringing, his experience as a child soldier, and his criminal history. For instance, the extent of a young person's immaturity is in part a function of his childhood experiences. Neurological studies have concluded that severe childhood trauma is associated with changes to "the maturation of specific brain structures at particular ages" and a person's "capacity to coordinate cognition, emotion regulation, and behavior."[38] That Rengifo was subject to extreme trauma as a child soldier is beyond dispute. It is therefore reasonable to infer that Rengifo would exhibit immature patterns of thought at older ages than someone raised in a "normal" American context.

In addition, "juveniles are more vulnerable or susceptible to negative influences and outside pressures." _Roper v. Simmons_, 543 U.S. 551, 569 (2005). _Ramsay_ reviewed relevant findings from cognitive science and concluded that sentencing courts should consider juveniles' "enhanced susceptibility" to influence by others, rather than deliberative decision making. 2021 WL 1877963, at *11. _Ramsay_ similarly emphasized that "relative to adults' crimes, adolescents'

---

[38] Bessel A. van der Kolk, "The Neurobiology of Childhood Trauma and Abuse," 12 Child Adolesc Psychiatric Clin N Am 293, 294 (2003).

crimes are less a product of their choices and more a product of their environment." Id. at *12.

As the Government points out, the Court previously considered how Rengifo's susceptibility to FARC indoctrination and his compulsory dependence on the 57th Front's personnel and structure affected his culpability, both at the 2011 sentencing hearing and in its denial of the defendants' request to present a duress defense at trial. See Opp. 4-5. At both junctures, the Court concluded that Rengifo

> "[had not] lost his moral compass so completely that he did not recognize the wrongfulness of his acts or was so deprived either by outward pressure or fear or by inward absorption of the effects of his own history with the FARC that he lost the ability to reason, to balance, to make choices, or to carry out those choices." Sent. Tr. 46-47.

Nevertheless, the FARC placed Rengifo's youthful tendencies to susceptibility and dependency under extreme pressures. Unlike in Ramsay, this did not manifest in "a split-second, hot-headed choice," 2021 WL 1877963, at *14, since Rengifo's crime unfolded over ten months. See Opp. 15. But Rengifo's experience of indoctrination, isolation, guerilla training, and paramilitary activities indisputably contributed substantially to his willingness to participate in the hostage-taking plot.

Rengifo has subsequently demonstrated an impressive degree of maturation and rehabilitation, not only accepting responsibility for his criminal activities and but also rejecting the ideology that the FARC had beaten into him. This confirms that Rengifo was salvageable,

that his "heinous crime" was not "evidence of irretrievably depraved character. Roper, 543 U.S. at 570.

Before entering prison, Rengifo lacked any formal education and was illiterate. PSR ¶ 79. While incarcerated, he has learned to read and write in Spanish and English. Mot. 24. He has also become active in the prison church community, with a Supervisory Chaplain submitting a letter on his behalf describing how he "has been a leader in both the Spanish-speaking and English-speaking church community." ECF 161-4 at 2. The Probation Department and the Court acknowledged that Rengifo had accepted responsibility for his crime at the time of sentencing. See PSR ¶¶ 36-41, Sent. Tr. at 42 (defendant apologizing for his role in the kidnapping). But it is significant that Rengifo appears to have replaced his FARC indoctrination with a sincere religious belief and has come to terms with his responsibility for his actions, rather than merely blaming the FARC for his misfortune. See Mot. 25. Rengifo also has a significant record of attending programming while incarcerated and an excellent disciplinary record. See ECF 161-3 at 6 (BOP PATTERN risk analysis).

The Government seeks to discredit Rengifo's accomplishments because he was not serving a life sentence and so "could expect to reap the benefits of good time credit." Opp. 10. But the relevance of rehabilitation to a motion for sentence reduction is not whether the defendant's motivations were saintly. What matters is whether he has demonstrated a record of maturation and rehabilitation that makes it unlikely he will pose a future risk to public safety and likely he

will contribute productively to society instead of returning to criminal activity. Rengifo has amply demonstrated his growth and the Court strongly doubts that he will return to guerilla activities upon his return to Colombia.

Once again, however, the Court need not decide whether the combination of Rengifo's youth when he committed his crime and his considerable rehabilitation thereafter would, by themselves, be sufficient to constitute an extraordinary and compelling set of circumstances warranting his relief. Rather, it is enough to find, as the Court does, that they are part of a mix of circumstances that support the second prong of compassionate release.

## C. **Family Circumstances**

Rengifo, who was abducted from his family by the FARC at age 13, asks the Court to also consider the rapidly deteriorating health of his family members. Rengifo's initial motion papers stated that his mother and sister were both terminally ill, and that he would like to care for, and spend time with, them before they depart. Mot. 12-14. Unfortunately, Rengifo's counsel reports that his mother has since passed away. His sister, however, continues to receive chemotherapy and radiation treatments for cervical cancer. Rengifo's counsel reports that her cancer is expected to be terminal, though her exact prognosis is uncertain. Id.

The Government responds that while it "is sympathetic to [Rengifo's] sentiments, they do not provide a basis for compassionate release" because "he does not claim to be a necessary caregiver for

them." Opp. 14. Indeed, previous cases have highlighted the necessary role that other defendants have played in caring for ill family members and considered the resulting hardships on their family members as an extraordinary and compelling reason warranting release. See, e.g., United States v. Hasanoff, 2020 WL 6285308, at *4 (S.D.N.Y. Oct. 27, 2020) ("Hasanoff has demonstrated that his mother requires constant care and that Hasanoff himself is the only available caregiver."). But the Government provides no authority for the proposition that being a necessary caregiver is the only manner in which a family member's failing health is cognizable on a motion for compassionate release. Nor could it: under Brooker, this Court is not bound by the strict criteria set forth in the Sentencing Commission's policy statement regarding a defendant's status as the only available caregiver for his child or partner. See Hasanoff, 2020 WL 6285308, at *3.

Here, Rengifo's claim is different but still compelling. He asks the Court to consider his interest and his sister's interest, in spending time together before she passes away from cervical cancer. His mother's death, which occurred between the time his motion was filed and argued, underscores the obvious point that Rengifo's request is time-sensitive.

It is true that illness of a close family member would not weigh in favor of releasing every incarcerated person. A "felon's family members are almost always among the primary victims of the result of his misconduct." Henareh, 2021 WL 119016, at *4. However, while

hardship to family members may be foreseeable, this terminal illness was "not particularly foreseeable and has imposed still further hardships and strain." Id.

More important, Rengifo's case is once again extreme. Since he was a small child, Rengifo has been repeatedly denied the opportunity to spend any significant time with his family, first by the FARC, which abducted him and transformed him into an isolated child soldier, and then by his imprisonment, first in Colombia and then thousands of miles from home in the United States. Both his parents have died, and now his sister is gravely ill. Rengifo and his sister understandably want to spend time together while that is still possible. Even for Rengifo, this desire would not alone entitle him to sentence modification. But considering Rengifo's unique personal history of forcible isolation from his family and the potentially limited time in which he may still be able to commune with his sister before the cancer takes her, the Court finds that his family circumstances contribute to the combination of extraordinary and compelling reasons warranting his early release.

D. **Conditions of Confinement**

Rengifo argues that he has experienced unusually harsh conditions of confinement as a consequence of the lockdown measures undertaken to control the spread of COVID-19 in prison. Mot. 26-27. These conditions include "constant lockdowns and other unusually severe conditions of confinement necessary to reduce the risk of COVID infection in the close quarters of a prison." United States v. Henareh,

35

2021 WL 119016, at *5 (S.D.N.Y. Jan. 13, 2021). Rengifo argues that these lockdown measures rendered the last year and a half of his sentence significantly "harsher and more punitive than would otherwise have been the case." United States v. Rodriguez, 492 F. Supp. 3d 306, 311 (S.D.N.Y. Sept. 30, 2020). See also United States v. Garcia, 505 F. Supp. 3d 328, 332 (S.D.N.Y. Dec. 8, 2020) ("[H]eightened restrictions imposed upon all prisoners during the pandemic ... ma[de] the conditions of confinement harsher, both physically and psychologically, than they would otherwise normally be."). Rengifo also contracted COVID-19 himself, and he avers that he continues to suffer symptoms from the disease, although they appear to be relatively mild. Mot 26.[39] This Court and others have previously recognized that incarceration under these conditions may render the sentence served by a defendant "materially different from the sentence the Court envisioned." Henareh, 2021 WL 119016, at *5.

As the Government points out, Rengifo does not claim to suffer from any of the comorbidities that raise his risk of developing a serious case of COVID-19, and this heightened risk was material to the Court's decisions in Rodriguez and Henareh. Opp. 11. But the fact that Rengifo does not have a heightened risk of severe illness does not mitigate the harsh lockdown conditions he experienced as an inmate during the height of the pandemic and before the availability of COVID-19 vaccines. Nor does it detract from Rengifo's experience that his

---

[39] Rengifo has since been fully vaccinated against COVID-19.

was not "an especially harrowing ordeal as compared to the average federal inmate" incarcerated during the lockdowns. Opp. 11. The unanticipated severity of those lockdown conditions constitutes another circumstance that, in combination with the other factors discussed above, collectively amounts to an extraordinary and compelling reason for early release.

In sum, while none of the foregoing factors would necessarily be sufficient to meet the second prong if taken alone and out of context, here the Court concludes that the material changes in Colombian law resulting from the 2016 peace accord between the Colombian government and the FARC, Rengifo's youth at the time of his offense and his considerable rehabilitation thereafter, his dire family circumstances, and his conditions of confinement during the COVID-19 lockdown, together establish that there are extraordinary and compelling reasons warranting modification of his sentence.

## V.  **Section 3553(a) Sentencing Factors and the Amount of Sentence Reduction**

The Court turns, then, to the third and fourth requirements for compassionate release. Specifically, once a defendant has exhausted administrative remedies and been found to have extraordinary and compelling reasons for a sentence reduction, the Court may modify his term of imprisonment only if it determines that the amount of reduction is consistent with the sentencing factors set forth in 18 U.S.C. § 3553(a).

Rengifo asks the Court to reduce his sentence to time served, so he can return to Colombia as soon as possible and rejoin his sister before she passes away. Given his pending release date of December 31, 2022, granting this request would therefore result in a sentence reduction of approximately 14 months.[40] The Court concludes that the relatively modest reduction is fully consistent with the Section 3553(a) factors.

Of course, it can never be forgotten that Rengifo committed a heinous crime that traumatized an American citizen and terrified his family. There must be no doubt that "the United States will do everything in its power to protect its citizens wherever they may be" and "what[ever] harm they may ... face[]." Sent. Tr. 47. That Rengifo was apprehended in Colombia, prosecuted in this Court, and has now been incarcerated for more than a decade in U.S. prison confirms that the necessary deterrent message was sent. The Court concludes that granting Rengifo's motion does not undermine that deterrent. And, as discussed above, the Court finds that Rengifo has been sufficiently rehabilitated, and that the conditions in Colombia have sufficiently changed, that he poses no further threat to public safety. Furthermore, considering that time is of the essence if Rengifo is to spend any time with his ailing sister before she passes, and that Rengifo will be at least briefly detained after his prison release before being

---

[40] Rengifo contends that if he were a citizen, he would be eligible for release on December 31, 2021, approximately two months from now, so that the reduction would be even less. Mot. 29.

deported, the only sensible modification of Rengifo's sentence is to reduce it to time served. Therefore, reducing Rengifo's sentence to time served would not be inconsistent with the section 3553(a) factors.

## VI.    **Conclusion**

For the reasons set forth above, the Court grants Rengifo's motion for a sentence reduction to time served.


SO ORDERED.

New York, NY
October 29, 2021                          JED S. RAKOFF, U.S.D.J.